**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Charles A. SCHAFER,
Defendant-Appellant.**

No. 77–5736.

United States Court of Appeals,
Fifth Circuit.

Sept. 20, 1978.

William L. Runyon, Jr., Charleston, S.C. (Court-appointed), for defendant-appellant.

Wm. T. Moore, Jr., U. S. Atty., Augusta, Ga., M. Carr Ferguson, Asst. Atty. Gen., Gilbert E. Andrews, Chief, Appellate Sec., Robert E. Lindsay, Richard B. Buhrman, Attys., Tax Div., Dept. of Justice, Washington, D.C., for plaintiff-appellee.

Before COLEMAN, GEE and HILL, Circuit Judges.

COLEMAN, Circuit Judge.

Charles A. Schafer appeals from his conviction by a jury on three counts of willful evasion of federal income taxes.[1] The government established its case through the "net worth" approach, a method of circumstantial proof which basically consists of five steps: (1) calculation of net worth at the end of a taxable year, (2) subtraction of net worth at the beginning of the same taxable year, (3) addition of non-deductible expenditures for personal, including living, expenditures, (4) subtraction of receipts from income sources that are non-taxable, and (5) comparison of the resultant figure with the amount of taxable income reported by the taxpayer to determine the amount, if any, of underreporting. Because the evidence established with reasonable certainty the beginning net worth and the increase in net worth for each year in question (with proper allowance for corrections in expendi-

1. 26 U.S.C. § 7201, the applicable statute, provides:

Any person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, shall be fined not more than $10,000, or imprisoned not more than 5 years, or both, together with the cost of prosecution.

tures and sources of income), and because there was sufficient evidence from which a jury could infer the requisite element of willfulness, we affirm the judgment of conviction.[2] We also find that the government discharged its burden under *Holland v. United States*, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150 (1954), to follow up all leads furnished by the taxpayer that are inconsistent with the taxpayer's guilt and reasonably susceptible of being checked.

## I. *Background*

To his friends and neighbors in Augusta, Georgia, Charles A. Schafer must have been the very embodiment of the entrepreneur who builds a small company into a sprawling corporate empire and acquires substantial wealth in the process. From a small partnership, National Audiotronics (National), which apparently specialized in supplying long-playing stereo tapes to funeral homes, Schafer expanded his operations in the early part of this decade until either he or members of his immediate family owned or substantially controlled the following business enterprises: Bluebird Auto Music Corp. (Bluebird); Custom Recording Company (Custom); Stereo City, Inc.; National Audiotronics; Stereo Village, Inc.; International Recording Studios, Inc. (International); Cutlass Records, Inc. (Cutlass); Charles A. Schafer Industries; Redball Electronics Corp. (Redball); WABB Corp.; Stamps and Collectors Items, Inc.; Charles A. Schafer Collections; Land Ho, Inc.; and perhaps others. Although his primary line of business activity continued to be stereo tapes, he branched out into other fields, such as ice cream parlors.

By the time of the tax years in issue (1970, 1971, and 1972), Schafer began to lead a lifestyle of conspicuous consumption.[3] He accumulated large, expensive collections of coins and stamps. He purchased diamond rings from Tiffany & Co., fur coats and other apparel for women from Bergdorf Goodman in New York, and art work from the Ormond Beach, Florida, Art Galleries. He and his wife purchased two large adjacent lots in Augusta, built a fence along the rear property line, paid substantial sums to an architectural firm to design a 7000 sq. ft. house, and, in 1972, began construction work on that house. He also invested heavily in stocks and bonds. Charles A. Schafer had become a man of means.[4]

2. Appellant was sentenced to five years imprisonment on Count 1 and three years probation on Counts 2 and 3, with probation to commence upon the expiration of, or legal release from, imprisonment under Count 1. As a special condition of probation, the defendant was to pay a fine of $10,000 and cooperate with the IRS in the payment of all taxes, interest and penalties due on his 1971, 1972 and 1973 income. Appellant argues that the five-year sentence of imprisonment actually amounts to a life sentence and therefore exceeds the statutory sanction. However, there is no indication in the record that appellant is in poor health, nor is there any indication of his age. Even if such evidence had been introduced, the argument would be without merit. In the federal system today, a trial judge has broad discretion in the determination of the sentence to be imposed upon a convicted defendant. *See, e. g., United States v. Tucker*, 404 U.S. 443, 446, 92 S.Ct. 589, 30 L.Ed.2d 592 (1972). The sentence imposed was within the statutory limits and is unassailable on appeal, absent some clear showing that the trial judge abused his discretion. *Gore v. United States*, 357 U.S. 386, 393, 78 S.Ct. 1280, 2 L.Ed.2d 1405 (1958); *Finch v. United States*, 5 Cir. 1974, 493 F.2d 455, 456;

*United States v. Saunders*, 5 Cir. 1970, 435 F.2d 683, 684.

3. *See* T. Veblen, The Theory of the Leisure Class (1899).

4. There was substantial evidence introduced and admitted at trial from which the jury could infer that the defendant paid for many of these purchases with checks drawn on the accounts of his businesses, particularly the accounts of National and Custom. For example, Mr. Robert A. Siegel, a noted stamp dealer and auctioneer with 47 years' experience, testified that the defendant made at least 29 separate purchases of stamps from him in the years 1969–71, and he identified a number of checks he had received from the defendant in satisfaction of those purchases. Most of these checks were drawn on the accounts of National and Custom and were signed by the defendant. Several other stamp dealers also testified as to their transactions with the defendant and identified their invoices and the checks which they had received from Schafer in payment. In elaborate and detailed testimony, the government's expert witness, an IRS agent who had testified in some seventy tax evasion cases, summarized

There was only one problem with this success story—Schafer allegedly evaded the payment of his lawful share of the federal income tax burden for the years in question. On his returns, he reported net taxable income of $4,525.00; 9,235.32; and 11,823.94 for those three years. He paid a total of $4,294.24. At trial, the government's expert witness, who based his testimony solely upon the evidence adduced in court, calculated the defendant's net taxable income at $51,935.17; 58,897.28; and 92,567.36 for the same three respective years. The expert witness further testified that the tax on that net income would total $64,505.69, a figure over fifteen times the amount which the defendant actually declared and paid.

In this criminal prosecution for the willful evasion of income taxes, the government was required to prove three elements of the crime beyond a reasonable doubt: (1) an additional tax due and owing, (2) an attempt to evade or defeat such taxes, and (3) willfulness. *Sansone v. United States*, 380 U.S. 343, 351, 85 S.Ct. 1004, 13 L.Ed.2d 882 (1965); *Holland v. United States*, 348 U.S. 121, 130–139, 75 S.Ct. 127, 99 L.Ed. 150 (1954); *United States v. Calles*, 5 Cir. 1973, 482 F.2d 1155, 1158. In any tax evasion case where the government attempts to prove the violation through the net worth method,[5] the jury is necessarily asked to determine guilt or innocence largely through circumstantial evidence. Specifically, the jury is asked to infer guilt from the existence of a substantial increase in net worth, which, when coupled with the negation of all reasonably possible sources of non-taxable income, can only be attributed to unreported taxable income. *See Holland v. United States, supra,* 348 U.S. at 125, 75 S.Ct. 127; *United States v. Tunnell,* 5 Cir. 1973, 481 F.2d 149, *cert. denied,* 415 U.S. 948, 94 S.Ct. 1469, 39 L.Ed.2d 563 (1974); *Merritt v. United States,* 5 Cir. 1964, 327 F.2d 820. *See also United States v. Horton,* 5 Cir. 1976, 526 F.2d 884, 886, *cert. denied,* 429 U.S. 820, 97 S.Ct. 67, 50 L.Ed.2d 81 (1976). Because of the dangers inherent in this type of prosecution, where many figures represent only approximations and where the defendant has a constitutional right to remain silent and put the government to its proof, the government must prove that it has conducted a full and adequate investigation of the defendant's finances and that it has followed up all leads furnished by the taxpayer that are "reasonably susceptible of being checked". *Holland, supra,* 348 U.S. at 138, 75 S.Ct. 127.

In this case, the government's investigation consumed some four years and uncounted manhours. The taxpayer's individual records, including bank accounts, were minutely examined, as were the records of all of Schafer's associated business enterprises, with the sole apparent exception of Cutlass' records, a fact which will later be discussed in detail. The trial lasted four days, and the 24 witnesses produced 628 pages of transcript. The government introduced some 553 documents in evidence, for the most part without objection. The defense rested on the government's case. On appeal, Schafer advances a number of contentions, which, for purposes of discussion,

---

the purchases and sales of stamps and demonstrated year-end investments in stamps for the years 1969–72 of, respectively, $4,945.82; 34,488.60; 218,723.28; 309,255.36.

5. The net worth method is explained in detail in Duke, Prosecutions for Attempts to Evade Income Tax: A Discordant View of a Procedural Hybrid, 76 Yale L.J. 1 (1966). In this case, the government's expert witness fully explained the theory and the mechanics of the net worth approach to the jury.
Appellant argues that he was denied due process because the government actually prosecuted him on the specific item-omission theory when he was prepared to defend against a net worth prosecution. Besides one generalized reference to a dividend from Stereo Village, he fails to point to any other instances in the record. We are at a loss to understand the argument, for it is clear that evidence of specific items of unreported income is admissible in a net worth case to show a "likely source" from which the net worth increases may have come. *Holland v. United States,* 348 U.S. 121, 138, 75 S.Ct. 127, 99 L.Ed. 150 (1954). Furthermore, appellant has demonstrated neither surprise nor prejudice, and he did not make any objection at trial that the government was utilizing a specific item-omission theory.

we divide into two categories: (1) the sufficiency of the evidence, and (2) the asserted failure of the government to follow up leads.

## II. *Sufficiency of the Evidence*

### A. *The Existence of a Tax Deficiency*

Schafer first attacks the government's computation of his tax liability. He argues that the calculation of opening net worth was inadequate, that much of the evidence was unduly speculative, and that the prosecution's expert witness should not have been allowed to testify. It has been somewhat difficult for us to analyze the nature of his complaints, however, because of the shotgun approach taken in the brief and the lack of focus on specific items. Because of these difficulties, we now attempt to construct an item-by-item description of the computation of Schafer's tax liability for the first prosecution year, 1970.

The case was exceedingly complex, but much of the complexity must be directly attributed to the tangled, interlocking financial affairs of the taxpayer and his numerous associated business entities. On numerous occasions, Schafer paid for personal expenses and purchases with checks drawn on the accounts of those entities.

Mr. Schafer also bases part of his defense on large losses allegedly sustained by Cutlass, whose affairs have been about as difficult to untie as the proverbial Gordian Knot. In order to assist the jury in organizing and understanding the mass of testimony and documents before them, the government relied upon its expert witness, Mr. Ralph Williams, an IRS agent, who has testified in over seventy such trials. Williams prepared one large chart which summarized the evidence presented at the trial and computed the tax owed under the net worth approach, as well as a smaller chart which summarized Schafer's stamp transactions. He stated that all of his figures were based upon either direct testimony or documents admitted in evidence. Schafer has failed to point out a single figure which was improperly computed (although he does

mount other challenges to Williams' testimony), and our independent examination of the record convinces us that a solid evidentiary foundation had successfully and properly been laid for his testimony. It is well settled that such expert testimony is permissible in a tax evasion case, provided, of course, that the expert testifies on the basis of facts in evidence. *United States v. Johnson*, 319 U.S. 503, 519–20, 63 S.Ct. 1233, 87 L.Ed. 1546 (1943). The trial judge properly charged the jury as to the weight to be given to the expert's testimony, and he therefore committed no error in allowing Williams to testify. Indeed, without Williams' testimony, the jury might well have been hopelessly confused, for it would have been well-nigh impossible for them to determine whether Schafer in fact had substantially underpaid his taxes.

To compute Schafer's net worth at the beginning of 1970, Williams added up Schafer's assets and then subtracted his liabilities. Contrary to what Schafer argued at trial and now presses on appeal, it was not necessary for the government to establish the basis for every asset the taxpayer owned. It was sufficient for the government to identify with reasonable specificity Schafer's basis in every asset, including cash, in which a purchase or sales transaction occurred in the tax years in question. For example, the government did not list furniture owned by Schafer in its net worth computation, but it seems reasonable to suspect that he owned furniture at the beginning and at the end of this three-year period. If, however, Schafer neither bought nor sold furniture during this period, it is totally immaterial whether furniture is included in the computation. If he owned $20,000 of furniture at the beginning of 1970 and $20,000 of furniture at the end of that year, the two figures would balance in the net worth computation. If, on the other hand, he owned $100,000 of furniture at the beginning, sold $80,000 without realizing a profit and invested the proceeds in stocks, the omission of furniture from the beginning net worth computation would make it appear that the taxpayer had expe-

rienced an $80,000 increase in net worth, namely through an increased investment in stocks. If such transactions have occurred, the taxpayer has a burden to furnish "leads" on them, so that the government can investigate and perhaps clear the taxpayer prior to trial. *See Holland v. United States*, 348 U.S. at 135–136, 75 S.Ct. 127; part III, *infra*.

The most frequent challenge to the government's computations in a net worth case is to the opening cash balance. See, *e. g., Hayes v. United States*, 5 Cir. 1969, 407 F.2d 189, *cert. dismissed*, 395 U.S. 972, 89 S.Ct. 2133, 23 L.Ed.2d 777 (1969). This is understandable, since it is often difficult to disprove the existence of a large "cash hoard", but nevertheless the government must establish this figure with reasonable specificity. Here, the taxpayer himself told the IRS agents in April, 1973, that he never had more than three or four-thousand dollars on hand (representing undeposited business receipts), that in 1968 he rarely had more than twenty dollars in cash, and that in April, 1973, he had about eight hundred dollars in cash. The agents therefore credited him with $800.00 in cash at the beginning of 1970 and at the end of each year in question, and they gave his wife credit for $200.00 in cash at each point, for a total of $1,000.00. The jury could certainly have concluded that Schafer's propensity to incorporate and place many of his personal assets in the corporate solution negated the existence of a large cash hoard and corroborated the agent's figure of $1,000.00. Furthermore, Schafer has never asserted that such a hoard did in fact exist.

As for other assets, the parties stipulated that the balances in the checking accounts totaled $142.67 and that there were no funds in savings accounts. No balance for coins was listed, because there was no indication from the taxpayer that he possessed significant coin holdings, the sale of which might explain the increases in his other assets. Schafer did, however, make several purchases of coins in 1970 and 1972, and the IRS agents properly added those purchases to his holdings. The only evidence concerning Schafer's stamp collection at the beginning of 1970 were invoices from Robert A. Siegel and Southeastern Stamp Company indicating total purchases of $4,945.82. The agents used this figure for the opening balance. Although Schafer strenuously objects to this figure, he has furnished no "lead" that the government could track down nor has he introduced any rebuttal evidence. Absent some indication of other purchases, the jury could readily find that the value of Schafer's stamps was established with reasonable certainty.[6] The only investment in stocks and bonds which the agents were able to discover totaled $824.67. He had no loans receivable at the start of 1970, and his two Pontiac automobiles cost a total of $9,477.39. One car was later traded in, and both remaining cars

---

**6.** The defendant objected at trial, and continues to object on appeal, that the government failed to prove the beginning net worth (at the end of 1969) with any degree of certainty. The implication of the assertion is that Schafer possessed a large collection of stamps at the beginning of the period, the subsequent sale of which might have accounted for the apparent increase in his net worth. He therefore concludes that the government has failed to meet its *Holland* burden of establishing the beginning net worth with reasonable certainty. We think this argument is flawed for several reasons. In the first place, the IRS agents contacted all persons with whom the defendant bought and sold stamps during the years in question. These names were supplied by the defendant himself. The net worth approach depends upon identifying all transactions in the assets, not simply the fact of possession of assets. That is, if Schafer owned one million dollars worth of stamps at the beginning of the period, purchased two hundred thousand dollars of stamps during the year, and sold one hundred thousand dollars of stamps during that same year, his investment in stamps would have increased by one hundred thousand dollars. It is immaterial whether the stamps sold come from the original holdings or from the year's purchases; the object is to measure the change in investment in the particular asset as a result of purchases and sales. Second, even if the increase in net worth were attributable to the sales of other stamps, the defendant has failed to disclose the identity of the buyers. In such a case, when the government has pursued all the leads provided by the taxpayer, he "remains quiet at his peril." *Holland v. United States, supra*, 348 U.S., at 138–39, 75 S.Ct. 127.

were then transferred to Schafer's related entities. As for real estate, an affidavit established that the Schafers had purchased their house and lot for a total of $31,050.00. There was no evidence introduced concerning possible additions to this property before 1970, and the figure of $31,050.00 was carried forward for each taxable year. This house, therefore, did not affect the net worth computation.

The final and perhaps most elusive asset listed was investments in related entities and was valued by the IRS at $38,221.64. Williams first took the tax returns filed by National and determined that Schafer's 50% investment in that partnership amounted to $10,221.64. Since the bulk of National's assets were transferred in 1970 to Custom and National filed no further tax returns, the agents concluded that National no longer operated as a partnership and that Schafer had no investment in it. The agents also identified five separate infusions of Schafer's money into Bluebird prior to 1970, and they concluded that his investment in that corporation totalled $28,000. They could identify no other investments in business entities prior to 1970, so the total figure for investments was $38,221.64. Schafer's assets therefore totalled $85,662.19 in the net worth computation.

The calculation of Schafer's liabilities was more straight-forward. Based upon the evidence admitted, accounts payable totalled $541.85; loans payable, $24,090.05; mortgage payable, $26,383.51; and judgments payable, $19,013.87. Since total liabilities were $69,029.28, Schafer's beginning net worth was determined to be $16,632.91. We find no disparity in this computation sufficient to warrant reversal.

Williams then proceeded to calculate Schafer's net worth at the end of each successive tax year, but we shall go into detail only for the year 1970. In that year, Schafer's assets climbed to $114,559.65, with the increase primarily attributable to increases in loans receivable, stamps, and coins. His liabilities declined to a total of $52,314.77, with the decline due mainly to large drops in loans payable and judgments payable. We are satisfied that the calculation of Schafer's end-of-1970 net worth as $62,244.88 met all legal requirements. To this increase in net worth, Williams added personal expenditures of $12,718.38. This figure was based on testimony that Schafer had: (1) purchased jewelry from Tiffany in the amount of $6,307.50; (2) paid $1,172.00 on an inherited apartment; (3) paid an old debt of $2,937.20 to Frank Carpenter; (4) paid another debt of $50.00 to Fred M. Simms; (5) paid yet another debt of $1,002.68 to a third individual; and (6) paid $499.00 in tax. Plainly, Schafer has nothing to complain of with respect to these additions, for the IRS did not even attempt to introduce evidence of other non-deductible general expenses, such as food, utility bills, etc.

■ The agents also deducted a total of $6395.18 to reflect allowable deductions and certain non-taxable sources of income. In 1970, Tiffany refunded $955.00 to Schafer. He received a judgment debt of $2303.38. He got the maximum allowable credits for dividend exclusion, personal exemption, and sales tax. All told, Williams calculated Schafer's taxable income for 1970 at $51,935.17, which was more than 11 times the $4,525.00 Schafer reported. Schafer would have owed $10,791.30 on his 1970 income; he actually paid only $651.00. The jury was certainly warranted in finding that a substantial tax was due and owing on that income.

Similarly, the evidence was more than sufficient for the jury to find beyond a reasonable doubt that tax deficiencies existed for 1971 and 1972. We are also convinced that the net worth computations were reasonably certain and feel that no purpose would be served by further recital of the testimony to demonstrate the accuracy of the expert's calculations.[7]

7. Appellant raises a host of related arguments, none of which have any merit. First, he argues that the expert should not have been allowed to

testify, but he cites no authority and we can find nothing to support him. See Fed.R.Evid. 702–705. Second, he claims that the expert's

### B. *Willfulness*

█ In a prosecution under 26 U.S.C. § 7201, the element of willfulness or intent is usually the most difficult to prove. In the misdemeanor and felony tax evasion statutes (26 U.S.C. §§ 7201 to 7207, inclusive), the word "willfully" generally connotes a voluntary, intentional violation of a known legal duty. *United States v. Pomponio*, 429 U.S. 10, 97 S.Ct. 22, 50 L.Ed.2d 12 (1976) (per curiam); *United States v. Bishop*, 412 U.S. 346, 93 S.Ct. 2008, 36 L.Ed.2d 941 (1973). Proof of evil motive or bad intent is not required. *Pomponio, supra.* This showing of willfulness will most often be made by circumstantial evidence,[8] *see e.*g., *Spies v. United States*, 317 U.S. 492, 63 S.Ct. 364, 87 L.Ed. 418; *United States v. Brown*, 5 Cir. 1977, 548 F.2d 1194; *United States v. Burrell*, 5 Cir. 1974, 505 F.2d 904; *United States v. Jernigan*, 5 Cir. 1969, 411 F.2d 471, *cert. denied*, 396 U.S. 927, 90 S.Ct. 262, 24 L.Ed.2d 225 (1969), since direct proof of willfulness, as that term is defined in *Pomponio* and in *Bishop*, may not be readily available.

█ In this appeal after conviction by a jury, we must sustain the verdict if there is substantial evidence, taking the view most favorable to the government to support it. *Glasser v. United States*, 315

---

testimony "was speculative, not based on sufficient evidence and was not sufficient to prove a tax due and owing beyond a reasonable doubt". Brief for appellant at 10. We have discussed the arguments surrounding the stamp collection at note 6, *supra*. Appellant claims that the government failed to assign values to assets of known existence, such as song copyrights. In the first place, there was no indication from Schafer that he owned such assets. Secondly, there was no indication that he bought or sold such assets during the prosecution years. See, pp. 778–779, *supra*. Finally, appellant urges that the testimony surrounding the ice cream parlor lacked specificity. It seems that appellant is the only one confused about this particular testimony. When appellant bought WABB, Inc., which owned the ice cream franchise, he paid for that purchase with a check from Custom. Williams charged appellant with an asset in WABB, Inc., and credited him with a liability to Custom in the same amount. In short, this purchase did not affect the net worth computation. Finally, appellant contends that the trial court should have directed a verdict of acquittal based upon alleged errors and inconsistencies in the expert's testimony. We find these contentions either repetitive (and dismissed elsewhere in this opinion) or insubstantial (and therefore dismissed summarily here).

8. Circumstantial proof of intent may be made in a variety of ways:

By way of illustration, and not by way of limitation, we would think affirmative willful attempt may be inferred from conduct such as keeping a double set of books, making false entries or alterations, or false invoices or documents, destruction of books or records, concealment of assets or covering up sources of income, handling of one's affairs to avoid making the records usual in transactions of the kind, and any conduct, the likely effect of which would be to mislead or to conceal. If the tax-evasion motive plays any part in such conduct the offense . . . may also serve other purposes such as concealment of other crime.

*Spies v. United States*, 317 U.S. 492, 499, 63 S.Ct. 364, 368, 87 L.Ed. 418, 423.

Willfulness may also be shown by affirmative acts of evasion such as concealment of financial transactions and the providing of false or incomplete information in an attempt to hamper the investigation . . . . *Holland v. United States*, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150 (1954); *United States v. Stone*, 431 F.2d 1286 (5th Cir. 1970), cert. denied, 401 U.S. 912, 91 S.Ct. 879, 27 L.Ed.2d 811 (1971); *Windisch v. United States*, 295 F.2d 531 (5th Cir. 1961); *McGrew v. United States*, 222 F.2d 458 (5th Cir. 1955). A consistent pattern of understatement has been held to present a jury question as to willfulness, *United States v. Tunnell*, 481 F.2d 149 (5th Cir. 1973); *Holland v. United States, supra,* as had [sic] the failure to report a very substantial amount of income, *United States v. Schechter*, 475 F.2d 1099 (5th Cir. 1973); *Wardlaw v. United States*, 203 F.2d 884 (5th Cir. 1953). Finally making false statements to Treasury agents has been held to constitute the type of affirmative act of evasion necessary to permit a § 7201 conviction. *United States v. Beacon Brass Co.*, 344 U.S. 43, 73 S.Ct. 77, 97 L.Ed. 61 (1952); *United States v. Newman*, 468 F.2d 791 (5th Cir. 1972).

*United States v. Burrell*, 5 Cir., 1974, 505 F.2d 904, 911.

Generally, therefore, proof "of repetitious conduct [is] admissible for the limited purpose of showing the intent of the appellant, where, otherwise it might be claimed that the acts in the tax years were either inadvertent or innocent. See *Escobar v. United States*, 5 Cir. (1967), 388 F.2d 661." *United States v. Jernigan*, 5 Cir. 1969, 411 F.2d 471, 473.

U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *United States v. Warner*, 5 Cir. 1971, 441 F.2d 821, *cert. denied*, 404 U.S. 829, 92 S.Ct. 65, 30 L.Ed.2d 58 (1971). Our examination of the record convinces us that the record contains more than substantial evidence from which the jury could infer willfulness. The trial judge specifically refused the government's request to charge the jury by giving examples of conduct which could indicate the requisite intent, where there was no evidence to support such examples. He did, however, charge the jury as follows, based upon his perception of what the evidence tended to prove:

> You may consider if there was any concealment of assets, any covering up of sources of income, any handling of one's affairs to avoid the making of the usual records, and any conduct the likelihood of which would mislead or conceal. Now, I give you these instructions simply to illustrate the type of conduct from which you may infer intent to evade taxes, and if the tax evasion motive plays any part in such conduct, the offense may be made out even though the conduct I have mentioned might also serve some other purpose.

There was evidence of a consistent pattern of under-reporting large amounts of income here. In the three prosecution years, Schafer reported a total taxable income of only $25,584.26, whereas the government's figure demonstrated that he should have reported at least $203,399.81. The discrepancy was not due to a single, isolated transaction, but rather to a consistent pattern spread over three years. In addition, Schafer certainly handled his affairs in such a manner as to avoid the usual making of records. He reported no income from National after he transferred its assets to Custom, although National continued to sell funeral tapes and he continued to utilize its checking account to pay for his purchases. His records of his investments in, and loans to, his other corporations were equally abysmal. The IRS agents were required to construct the financial statements of many of those entities from the ground up, since there were few tax returns filed and gross-

ly inadequate records kept. When the IRS agents attempted to gain access to Cutlass' records for the purpose of investigating the "lead" furnished by the taxpayer, they were met with obstinate refusals. At least 16 summonses were issued, but the responses were inadequate and the records piecemeal. In fact, one of Schafer's agents told the IRS agents they would not produce the records "because this was what they were going to base their defense on". The jury certainly could have found that such conduct was designed to conceal or mislead.

And there was more. One agent testified that they had uncovered Schafer's own computations of his net worth. In August, 1969, Schafer computed his net worth at $64,000. By March, 1972, Schafer figured that he was worth $1,635,500, although he did state to the agents that this latter figure was "inflated" when they confronted him with the calculations written on his letterhead and signed in his hand. Although these statements were not introduced in evidence, the testimony stood unrefuted, and the jury could have credited it as evidence of Schafer's willfulness. Furthermore, Schafer made at least one false statement to an IRS agent. When asked whether he had any gifts or inheritances, or any nontaxable source of funds, Schafer indicated that he had received a $4,000 inheritance from an aunt. The agents later discovered that his son, not Schafer, had received such an inheritance.

We need not detail more of the evidence from which the jury could have inferred the requisite intent, but there is no doubt that this record, which is replete with incidents similar to those detailed above, contains not only substantial evidence, but perhaps overwhelming evidence, of the defendant's willfulness.

■ With willfulness thus established, defendant's filing of false and fraudulent income tax returns constituted an affirmative act of evasion. *Sansone v. United States*, 380 U.S. 343, 352, 85 S.Ct. 1004, 13 L.Ed.2d 882 (1965). The jury could also have found the requisite affirmative act

from any one of a number of other incidents in the record, some of which are detailed above.

### III. *The Asserted Failure of the Government to Follow Up Leads*

Appellant characterizes his contention that the government failed to follow up all leads which he supplied as "one of the most crucial questions in this case". However, we cannot appraise this point as being quite so "crucial".

 Schafer's contention here seems to be based entirely on large losses allegedly sustained by Cutlass in 1972. Cutlass, which was apparently issued a charter by the State of Tennessee in early 1972, was 98% owned by Schafer. Cutlass filed no federal income tax return for 1972 and the only solid testimony (if it can be so denominated) in the record as to the extent of Cutlass' losses was that of Mr. Howard Joe, an accountant for Custom. Joe was apparently sent to Nashville, Tenn., to try to organize Cutlass' records and he testified on cross-examination that a Mr. Ken Shears had told him that the losses were in the neighborhood of $457,000 or $475,000. There was no objection to this testimony, but on redirect Joe admitted that the losses might have occurred after 1972. The IRS agents knew about this alleged loss and attempted to track the lead down. They were met with a stonewall. The custodians refused to divulge the records voluntarily, and repeated summonses met with little cooperation. Finally, a scant month before trial, Cutlass delivered a mass of disorganized records stored in three filing cabinets to the IRS agents, who did not have sufficient time to analyze the records before trial. In these circumstances, we think the agents did all that could reasonably be expected of them. Cf. *Hayes v. United States*, 5 Cir. 1969, 407 F.2d 189, 193, *cert. dismissed*, 395 U.S. 972, 89 S.Ct. 2133, 23 L.Ed.2d 777 (1969). Furthermore, as was repeatedly explained at trial, corporate losses are not normally deductible against income reported by an individual. So even if these large losses were sustained by Cutlass, Schafer's income would be unaffected, unless he sold his stock at a loss or the corporation was adjudged bankrupt. Neither exception took place, and we therefore find that the government fully satisfied its *Holland* burden.

### Conclusion

If it is true that "[t]axes are what we pay for civilized society," *Compania General de Tabacos de Filipinas v. Collector*, 275 U.S. 87, 100, 48 S.Ct. 100, 105, 72 L.Ed. 177 (1927) (Holmes, J., dissenting), the defendant failed his duty by some sixty thousand dollars.

The Judgment of conviction is

AFFIRMED.