UNITED STATES of America, Plaintiff-Appellee,

v.

David H. TERRELL, a/k/a Daniel H. Ford, Defendant-Appellant.

No. 84–1366.

United States Court of Appeals, Fifth Circuit.

Feb. 14, 1985.

Charles J. Muller, III, San Antonio, Tex., Harvey G. Sanders, Jr., Greenville, S.C., for defendant-appellant.

Edward C. Prado, U.S. Atty., Sidney Powell, Jack O'Donnell, Asst. U.S. Attys., San Antonio, Tex., Michael L. Paup, Chief, Glenn L. Archer, Jr., Kent S. Robinson, Robert E. Lindsay, Appellate Sect., Tax Div., Dept. of Justice, Washington, D.C., for plaintiff-appellee.

Before GOLDBERG, POLITZ and WILLIAMS, Circuit Judges.

JERRE S. WILLIAMS, Circuit Judge:

David H. Terrell appeals from his conviction by jury on four counts of willfully attempting to evade federal income taxes for the years 1976 through 1979, in violation of 26 U.S.C. § 7201. The proof showed that appellant's taxable income during those years totaled in excess of $439,000, while he reported only $217,000. Appellant alleges, *inter alia*, that the government failed to establish a *prima facie* case as to his net worth starting point, and that the court erroneously shifted the burden of establishing the net worth starting point to him. Appellant also alleges several errors relating to jury instructions and evidentiary rulings. We find no error, and accordingly affirm.

## I. FACTS

David H. Terrell has made his living as an evangelist since the late 1950's. In 1965, he formed a tax-exempt corporation known as the New Testament Holiness Church. He preaches under the auspices of that church, while not receiving any direct compensation from the corporation. Because he received no direct compensation, appellant's income for the indictment period, 1976 through 1979, was reconstructed using the net worth plus expenditures method of proof.[1] Appellant's net worth increases and taxable income for the indictment period as established by the evidence are:

| Year | Net Worth Increases | Corrected Taxable Income | Taxable Income Not Reported | Tax Due and Owing |
|---|---|---|---|---|
| 1976 | $ 82,604.51 | $ 67,901.78 | $ 34,459.31 | $ 19,071.07 |
| 1977 | 69,451.27 | 72,764.42 | 35,355.77 | 18,289.75 |
| 1978 | 116,145.49 | 123,566.48 | 86,454.49 | 43,220.21 |
| 1979 | 200,760.47 | 194,121.32 | 84,846.70 | 42,232.56 |
| Total | $468,961.74 | $458,354.00 | $241,116.27 | $122,813.59 |

The increases in appellant's net worth over the indictment period were largely attributable to his acquisition of loan re-

---

1. The net worth method of reconstructing income is discussed *infra* in Part II.

ceivables, five parcels of real estate totaling 482 acres at a cost of $347,315, and tradings in sixteen automobiles, including several motor homes, at a total cost of $150,000. In addition, during 1978 and 1979, appellant paid cash for his $138,000 residence and a $29,000 guitar-shaped swimming pool.

The likely source of appellant's income was money earned through his ministry. Terrell preached daily at branches of his church and traveling tent revivals. At each service, in addition to collecting church offerings, appellant collected personal contributions known as "love offerings". Typically, a bucket would be placed in front of the congregation for church offerings, and Terrell would make an appeal to his audiences to help him personally by handing him money directly or placing it in one of the pockets of an apron that he wore at the time of the offerings. In addition, contribution envelopes were distributed at services resulting in the receipt of substantial sums of money through the mail at a post office box in Waco, Texas. After a particular service, receipts were at least partially recorded on slips of papers referred to as "love offering breakdowns". Although as a matter of course, the offerings received were counted and recorded on breakdowns after Saturday morning revivals, they were frequently not recorded for revivals during the week. Appellant had exclusive control over the record keeping process of the breakdowns. After services, the cash received and all records were placed in Terrell's possession. Despite the fact that Terrell would receive between $400 and $5,000 a week through the mail, the breakdowns only twice included receipts from offerings received in this manner, both times after he had been notified that he was the subject of a criminal investigation.

Terrell had been advised by his accountant that the money he personally received during services was taxable income. He was instructed to keep track of his receipts and report them to his tax return preparers. Terrell provided his tax return preparers with the "love offering breakdowns" as a purported record of his total receipts. The breakdowns were submitted weekly, and showed average gross weekly income of approximately $800 to $1,000. Yet Terrell told IRS agents that he often received $4,000 to $5,000 in the course of a week-long revival.

The evidence produced at trial represented a three-year investigation by the Internal Revenue Service. IRS agents consulted with Terrell at the beginning of the investigation and questioned him about his non-taxable sources of income to ensure that they would be excluded from the net worth calculations. At that time, Terrell and his attorney provided the agents with a list of his non-taxable sources of income dating back to 1967, including loans and various gifts that he had received while he was a minister. The list in a form of a book was represented to the IRS agents as itemizing "substantially all his gifts for those years". The Government credited appellant with all gifts indicated in the book, and built that figure into its net worth computation as non-taxable sources of income.[2]

In order to ensure that pre-indictment savings could not have accounted for the increases in Terrell's net worth, the government conducted a "source and application of funds" analysis of his finances between 1967 and 1975. The analysis showed that Terrell's expenditures exceeded his reported income plus nontaxable gifts during that period by $229,000. This analysis was used for the sole purpose of determining that appellant held no substantial cash-on-hand at the beginning of the indictment period.

During the time covered by the investigation, Terrell made several attempts to conceal his income. Terrell possessed numerous bank accounts with substantial bal-

2. Appellant was credited in the net worth analysis with total non-taxable gifts of $57,878 for the years 1976 through 1979.

ances, and dealt almost exclusively in cash. Among his cash purchases were an automobile for $12,000 and real estate for $25,000. When purchasing property in 1976, appellant paid a real estate commission of $10,000 and requested that the agent not report it until the following year. Also in 1975, Terrell legally changed his name to Daniel H. Ford and began purchasing assets in the name of Ford, including two farms of 375 and 400 acres. Yet he continued to file tax returns under the name of Terrell. During the course of the IRS investigation, Terrell discussed his real estate holdings with IRS agents but never mentioned those properties held in the name of Ford. He possessed 25 automobiles over the investigation period in six different names, using eight different home addresses. Real estate was purchased in six different names, and he maintained Texas driver's licenses in both the names of Terrell and Ford. Furthermore, in an attempt to characterize some of his expenditures as loan repayments, Terrell on two separate occasions approached individuals to execute loan papers in order to substantiate nonexisting loans.

Terrell was indicted on four counts of willful attempt to evade federal income taxes for the years 1976 through 1979, in violation of 26 U.S.C. § 7201. The indictment charged that he earned taxable income during those years totaling in excess of $439,000, while reporting only $217,000. His alleged tax liabilities for those years totaled in excess of $184,000, although he reported only $71,000. After a thirteen-day jury trial, Terrell was convicted on all four counts. He was sentenced to five years imprisonment to be served concurrently on counts One through Three, and a five-year sentence on Count Four was suspended and appellant placed on probation. Terrell was fined $5,000 on each count and ordered to pay the cost of prosecution. A notice of appeal was timely filed.

## II. NET WORTH STARTING POINT

■ Section 7201 of 26 U.S.C. imposes criminal sanctions upon "any person who willfully attempts in any manner to evade or defeat any tax imposed by this title". To establish a violation of § 7201, the Government has the burden of proving beyond a reasonable doubt that (1) the defendant owed taxes for the period in question; (2) that he attempted to evade payment of them; and (3) that he acted willfully. *Sansone v. United States*, 380 U.S. 343, 351, 85 S.Ct. 1004, 1110, 13 L.Ed.2d 882 (1965), *United States v. Dwoskin*, 644 F.2d 418, 419 (5th Cir.1981). The primary contention of appellant is that the Government failed to meet its burden of proof on taxes owing for the indictment period because the Government's reconstruction of appellant's income using the net worth method was incomplete.

■ Where a taxpayer's records are an inadequate basis for determining income tax liabilities, the net worth method of determining income has been utilized in criminal tax prosecutions to reconstruct income. Using this method, the Government first must establish the taxpayer's total value of assets at the beginning of a given period and compare that worth to the value of the taxpayer's assets at the end of the period. The Government must take into account cash-on-hand as an asset at the starting point of the net worth evaluation. Increases in net worth are subject to certain adjustments before it can be claimed that such increases represent income acquired over the period in question. For example, the Government subtracts from net worth increase any gifts, inheritances, loans and the like that may account for unexplained increases in net worth. Nondeductible expenditures are then added back into the net worth figure. Once these adjustments have been made, the Government attempts to prove that any unexplained increase in net worth represents unreported income.

■ The use of the net worth method in criminal tax prosecutions was approved in *Holland v. United States*, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150 (1954). The Court recognized that such a reconstruction of income might be the only way to prosecute individuals who kept inaccurate

records and who cleverly concealed income. But the Court's approval was given with the caveat that establishing unreported income by the net worth method "involved something more than the ordinary use of circumstantial evidence in the usual criminal case." *Id.* at 124, 75 S.Ct. at 130. The Court in *Holland* recognized that an innocent individual with poorly kept records may not always be in a position to explain discrepancies in net worth. In order to avoid the pitfalls of the net worth system, the Government must conduct a meticulous investigation, and the investigation techniques and figures are subject to close scrutiny. Moreover, the court must be particularly mindful of the potential dangers of using the method in drafting its instructions. *Id.* at 129, 75 S.Ct. at 132.

In *Holland,* the Supreme Court set out the standard that the Government must meet in order to establish a *prima facie* showing of tax evasion using the net worth method. The Government must establish with "reasonable certainty" an opening net worth as the basis upon which to calculate increases in the taxpayer's assets. "The importance of accuracy in this [net worth] figure is immediately apparent, as the correctness of the result depends entirely upon the inclusion in this sum of all assets on hand at the outset." *Id.* at 132, 75 S.Ct. at 134. Appellant argues that the Government has not met its burden of proving an opening net worth with reasonable certainty because it did not include certain assets in its starting net worth.

### A. *The Herd of Cattle.*

Appellant claims that he received as a gift a herd of cattle worth $76,500 in 1974, prior to the indictment period. He alleges that at least some of the cattle were sold sometime during the indictment period, and that the proceeds were used to purchase other property. He argues that the basis in all of the cattle should have been added to the starting net worth evaluation, and that the Government knew of the existence of the cattle during their investigation but

intentionally failed to take them into consideration in its net worth calculation.

Assets may be included in the net worth analysis at their basis so long as cost basis is consistently used throughout the analysis. *Dwoskin,* 644 F.2d at 421. Using cost basis to determine net worth means that assets preexisting the indictment period are a source of non-taxable funds only to the extent of that basis. Appellant contends that he had a herd of cattle with a basis of $75,600 that should have been included in the net worth starting point calculation. But appellant overlooks the elementary fact that the basis established in a net worth calculation is irrelevant so long as the same basis is used throughout and at the end of the calculation. Thus the only relevance of the herd of cattle already owned by appellant at the beginning of the tax period is to be found in purchases and sales of the cattle during that period. It is the profit and loss realized from such sales that have the sole relevance to the prosecution for income tax evasion. Actually, the cattle and cattle sales could at best create only a minor lessening of appellant's tax liability. But because he stresses them in his argument, we go into them in some detail.

No cattle sales were reported by Terrell for the years 1976 or 1978. On his 1977 return, he reported the purchase and resale of $1,600 worth of cattle. Terrell's income tax return for 1979 indicated that he had sold $19,981.73 worth of cattle in which he claimed no recoverable basis. This return was filed after his second interview with the Government. At this point, appellant had already turned over to the government the "gift book" in which he identified what he considered "substantially all" the gifts he had received for the years investigated. After receiving the 1979 tax return reporting the cattle sales, the Government once again contacted appellant to state that the return did not account for all his expenditures for the year and to inquire if there had been any additional sources of income. Nothing was said about the cattle, and

appellant never provided any leads to sales of cattle in which he had a basis.

In its investigation, however, the Government did discuss cattle sales with four witnesses, and all leads provided by those witnesses were traced. In addition to the sales reported on the 1979 return, the investigation turned up two additional sales. In 1977, Terrell apparently sold $9,000 worth of cattle which he did not report, and similarly, $6,000 worth in 1978. Because appellant had not volunteered any information concerning sales of cattle, the Government concluded that the proceeds for sale of cattle generated more unexplained increase in net worth. But even assuming, *arguendo*, that the basis of this cattle should have been included in the net worth starting point, and that appellant's basis in the cattle sold was equal to the total proceeds of the sales, the net worth starting calculation would have been off by a maximum of $15,600, the total of the unreported sales. Because the appellant's unreported income for 1977 and 1978 combined exceed $120,000, failure to credit him with the basis in cattle would have had a minimal impact on the net worth starting point. The amount of tax owing for those years would still have been in excess of $100,000.

■ Appellant, again overemphasizing the importance of the cattle in the case, also contends that the Government failed to establish a *prima facie* case because it failed to follow leads appellant had given them on the existence of the cattle. *Holland*, 348 U.S. at 135, 75 S.Ct. at 135, placed upon prosecutors using the net worth evaluation the burden of investigating leads that may be furnished by the taxpayer that could result in an explanation for increases in net worth. Failure to pursue leads that are reasonably susceptible of being checked could result in serious injustice. Terrell accuses the Government of not following leads to identify non-taxable sources of income, yet the evidence shows that appellant, even during the course of the investigation, continued to conceal information relating to cattle sales. Terrell did not provide the Government with a

single lead pertaining to the sale of cattle. Moreover, if a taxpayer has transactions in previously owned assets which provide him with non-taxable funds, "the taxpayer has a burden to furnish 'leads' on them, so that the Government can investigate and perhaps clear the taxpayer prior to trial." *United States v. Schafer*, 580 F.2d 774, 779 (5th Cir.), *cert. denied*, 439 U.S. 970, 99 S.Ct. 463, 58 L.Ed.2d 430 (1978) (citing *Holland*, 348 U.S. at 135–136, 75 S.Ct. at 135–136). *Schafer* also establishes that it is sufficient for the Government to identify with "reasonable specificity" a defendant's basis in assets. *Id.* at 778.

■ We find that the Government can in no way be faulted for failure to identify any possible basis in cattle. Even if Terrell did have a basis in these cattle, the effect on the net worth computation would be minimal because substantial sums for the years 1977 and 1978 would still be owing above and beyond the amount in question. Moreover, the Government was diligent in following up on all leads relating to the cattle, despite the fact that Terrell himself was uncooperative in providing leads.

B. *Source and Application of Funds Analysis: Cash-on-hand.*

■ Appellant also claims that the Government's starting net worth figures were inaccurate because he was not given credit for having any cash-on-hand at the beginning of the indictment period. In its net worth analysis, the Government concluded that there was no cash-on-hand, while Terrell claimed that he had approximately $200,000 at the beginning of the indictment period. The Government must take into consideration cash-on-hand as an element of its net worth analysis. While the source and existence of cash-on-hand need not be proved with mathematical exactitude, the amount must be established with reasonable certainty. *United States v. Boulet*, 577 F.2d 1165, 1170 (5th Cir. 1978), *cert. denied*, 439 U.S. 1114, 99 S.Ct. 1017, 59 L.Ed.2d 72 (1979). The question of whether a defendant has a substantial amount of cash-on-hand at the beginning of

the indictment period must be carefully investigated because the existence of a cash hoard could greatly distort the net worth evaluation. Unaccounted for funds that surface during the course of the net worth evaluation might be explained by the fact that a defendant accumulated large sums of cash which he kept on hand and began to spend during the indictment period.

As a means of determining whether appellant had an appreciable amount of cash-on-hand at the beginning of an indictment period, the IRS conducted a "source and application of funds" analysis. Under this analysis, appellant's sources of cash were compared with his expenditures over the investigation period. The surplus (or deficit) from each year covered when expenditures were subtracted from sources of funds was recorded as "net funds available". Net funds for the years 1967 to 1975 were added together to arrive at a "cumulative net funds available" figure. This "cumulative net funds" figure, indicating possible sources of cash accumulated over this preindictment period, represented how much cash appellant was likely to have had on hand at the beginning of an indictment period.

The Government began its investigation of Terrell's funds with the year 1967. All of his returns for the years 1967 through 1975 were examined, and gross receipts indicated on the returns were entered as part of the source of funds analysis. Added to those figures were any other sources identified by the appellant or other witnesses, such as appellant's proceeds from assets listed in his "gift book". As of December 31, 1975, the Government's analysis indicated that Terrell had expended nearly $230,000 more than his total accumulated funds for the nine-year period covered. This means that in order to have arrived even at a figure of zero for cash-on-hand for the net worth starting point figure, appellant would had to have had additional sources of funds between 1967 and 1975 totaling at least $230,000, and more than $400,000 of additional funds to have netted his $200,000 cash-on-hand figure. The only

use the Government made of the source and application of funds analysis was to conclude that any cash Terrell might have had on hand would not have been substantial enough to affect the opening net worth. This purpose was clearly presented to the jury, and no inference was made that the unaccounted-for expenditures for the investigation years 1967–1975 were at issue in Terrell's prosecution.

■ Appellant makes a second attack on the source and application of funds analysis, arguing that in its evaluation the Government unjustifiably relied upon his uncorroborated admissions concerning sources of funds. He relies upon *Smith v. United States*, 348 U.S. 147, 154–55, 75 S.Ct. 194, 198, 99 L.Ed. 192 (1954), which requires the Government to corroborate post-offense admissions regarding net worth. We have held, however, that the corroboration requirement does not necessarily extend to admissions relating to cash-on-hand, a figure that is ultimately incorporated into the starting net worth figure. *United States v. Normile*, 587 F.2d 784 (5th Cir.1979). In *Normile*, the Government relied on the defendant's statement that he had only $100 cash-on-hand at the beginning of the indictment period because he did not feel safe having larger amounts on hand. The court held that this statement did not necessitate corroboration because "the inherent secrecy of the cash hoard makes it impossible for any but the keeper to know even of its existence, let alone the amount." *Id.* at 786. Thus, we find no error in the use of the source and application of funds analysis to conclude that Terrell had no cash-on-hand at the beginning of the indictment period. The Government clearly met its burden of establishing this fact with reasonable certainty.

In reviewing the record in this case, we can only be surprised by appellant's attack on the thoroughness of the Government's investigation. The investigation consumed three and one-half years. Approximately 20 agents canvassed public records to de-

termine the extent of appellant's holdings. Thirty banks were contacted, and twenty banks produced documents or witnesses. Nearly 300 potential witnesses were interviewed, many of them several times. IRS agents identified in excess of 70 assets purchased and sold by Terrell, and questioned third parties involved in these transactions. Additionally, every expenditure made by Terrell was traced, including all cashier's checks traced back to their sources to determine how they were purchased.

We find appellant has not made a meritorious challenge to the procedures or figures used by the Government in its source and application of funds analysis. We conclude that there was sufficient evidence for the jury to find that there was no cash-on-hand at the beginning of the Government's net worth analysis.

### III. JURY INSTRUCTIONS

 Appellant also alleges several errors relating to the jury instructions. On the issue of net worth starting point, appellant claims that the testimony of several prosecution witnesses created the impression that he carried the burden of establishing the net worth starting point and that the court therefore erred in not giving the jury a requested instruction on the burden of proof to correct this impression. This argument is without merit. The trial court's instructions on the net worth method were thorough and accurate. The court clearly explained to the jury that the Government had the burden of proving beyond a reasonable doubt that substantial income tax was owing, and that the net worth method had been used by the Government to establish this element. In alleging the inadequacy of the instruction, appellant ignores the following portion of the charge:

> The burden is always upon the Government to establish beyond a reasonable doubt that any amount reflected in the Defendant's increased net worth, plus nondeductible expenditures, was from taxable, rather than non-taxable sources.

As for appellant's claims that comments by Government witnesses and the prosecutors implied that the burden of proof shifted to appellant, we have carefully examined these statements. If the comments could be taken to have implied a shift in the burden of proof, and we do not feel that they did, the instruction given clearly cured any such emphasis in testimony. *See Cupp v. Naughten,* 414 U.S. 141, 146–47, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973).

 Terrell also challenges the propriety of an instruction dealing with establishing basis in assets. He claims that the court committed error in instructing the jury that Terrell could not claim a basis in assets if he had not reported the receipt of the assets as income in a prior tax year. Appellant's argument refers to the following instruction:

> A taxpayer must report as income the fair market value of property received as income. If he fails to report the fair market value of an asset as income, he cannot later claim the fair market value as his basis. Instead, his basis would be zero.

Appellant reads this instruction out of context to imply that he could not claim a basis in the cattle because the cattle were received as gifts. We find no such implication in this instruction. The court was careful in framing its charge to the jury to state accurately the law concerning basis in assets received as income, and separately charged the jury on the proper treatment of gifts.

 Finally, appellant alleges that the court instructed the jury that all amounts received by a minister were taxable and that the court refused to instruct the jury on the elements of a non-taxable gift. This challenge is a gross misrepresentation of the charges given to the jury. The court instructed:

> The federal income tax is levied on income received by ministers. When an individual provides ministerial services as his trade or business, controls the money he receives in that business, and receives no separate salary, the income of that

business is taxable to the minister. Voluntary contributions, when received by the minister, are income to him. Payments made to a minister as compensation for his services also constitute income to him. If money is given to a minister for religious purposes, any money used instead for the personal benefit of the minister becomes taxable income to him.

The law provides that funds or property received from certain sources do not constitute taxable income. Since no income tax is levied on such funds or property, they are not properly reported as income. Such non-taxable funds or property includes such items as gifts, inheritances, the proceeds of life insurance policies, loans and other miscellaneous items.

The court thereafter properly charged the jury on the definition and elements of a gift.[3]

We find that the court's instructions were complete and accurate in all respects and reject all of appellant's objections to them as lacking in merit.

## IV. EVIDENTIARY RULINGS

■ Terrell argues that the court abused its discretion in failing to grant his motion for continuance. Where, as here, the purpose for requesting the continuance was for trial preparation, a defendant must show that the court acted with "unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay." *See Morris v. Slappy*, 461 U.S. 1, 11–12, 103 S.Ct. 1610, 1616, 75 L.Ed.2d 610 (1983).

■ Terrell's argument centers around the admission of the "source and application of funds" analysis prepared by the Government and submitted to the defense five days before trial. Appellant represents the analysis as a submission of computations covering the years 1967 to 1975 for the first time only days before trial. Although he does not deny the relevancy of the computations, he alleges he did not have sufficient time to examine the computations and adequately to prepare his defense.

The court properly denied appellant's motion for continuance on the ground that all of the information contained in the analysis had been in his possession for nearly six months. The analysis was a summary of appellant's tax returns over the investigation years, as well as other information, e.g., entries taken from the "gift book"

---

3. The instruction on gifts was as follows:

It is for you, the Jury, to decide whether certain funds are taxable or nontaxable to the Defendant. In determining whether a payment of money or property to the Defendant is a nontaxable gift, you should look to the intent of the parties at the time the payment was made, particularly the intent of the person making the payment. Such payments are gifts if they proceed from a detached and disinterested generosity, out of affection, respect, admiration, charity, or like impulses. In making this determination, however, you must look at all the facts and circumstances in this case. The characterization given to a certain payment by either the Defendant or the person making the payment is not conclusive. Rather you the members of the Jury, must make an objective inquiry as to whether a certain payment is a gift. You should look at the terms and substance of any request made by the Defendant for the funds. In addition, you may take into account the following factors:

1. A payment is not a gift if it is made to compensate the Defendant for his services. In this connection, you should consider how the defendant made his living.
2. A payment is not a gift if the person making the payment expects to receive anything in return for it. A payment would not be a gift if it was made with the expectation that it would allow the Defendant to remain in business.
3. A payment is not a gift to the Defendant if it is made with the expectation that it will be used to further the religious or ministerial activities of the Defendant.
4. A payment is not a gift if the person making the payment felt he had a duty or obligation to make the payment.
5. A payment is not a gift if the person making the payment did so out of fear or intimidation.

This is not a complete listing of all the factors you should consider. You should take into account all the facts and circumstances of this case in determining whether any payment was a gift.

given to the Government by appellant. In short, this analysis, which was completed by the Government in response to Terrell's repeated declarations that he had considerable sums of cash-on-hand at the beginning of the indictment period, presented no surprises for the defense. The district court acted well within its discretionary powers in denying the motion for continuance.

■ Terrell also alleges that the court erroneously denied his motion for severance of Count Four, the count involving the 1979 return. The request was made due to the involvement of defense counsel in the preparation of Terrell's tax return for 1979. Defense counsel Harvey Sanders and his firm, Leatherwood, Walker, Todd and Mann, were involved in drafting the return, advising changes, and providing some information to be included in the 1979 return. The Government first sought to disqualify defense counsel and his firm on the ground that their involvement in the 1979 return might become an issue at trial and that members of the firm were prospective Government witnesses. Defense counsel responded by moving to sever Count Four to avoid possible prejudice because of his involvement. After hearing, the court denied both motions, finding that defense counsel's testimony was not indispensable to the Government's case. As for the severance motion, the court accepted the Government's representation that the proof of all counts was essentially the same, and that, therefore, severance would not be warranted. The court also considered the fact that appellant hired an independent attorney, Charles Muller, to assist in his defense when it became obvious that the 1979 return was at issue. Attorney Muller had no connection with Mr. Sanders' firm, and he prepared and signed all defense pleadings in the case.

At trial, the Government did not call Mr. Sanders or any member of the Leatherwood firm as witnesses. The Government did make references to the involvement of defense counsel in the 1979 return, but only after obtaining the permission of the court. References to appellant's attorney were made only in the course of examining one Government witness who had provided accounting services for appellant in the preparation of his tax returns. Much of the information used by the accountant was received from defense counsel, and the Government's questions were limited to defense counsel's role as provider of such information.

■ The district court's denial of the motion for severance is reviewable only for abuse of discretion. *United States v. Hamilton*, 694 F.2d 398, 400–401 (5th Cir. 1982). In order to demonstrate abuse of discretion, the defendant bears a heavy burden of showing "specific and compelling" prejudice. *Id.*, (quoting *United States v. Morris*, 647 F.2d 568, 570 (5th Cir.1981)). We find that the trial court correctly denied severance and find no compelling prejudice to appellant that would call for reversal on this ground.

■ Appellant's final contention is that prejudicial testimony relating to his religious beliefs and general moral character was admitted at trial. We note that the Government repeated in opening and closing arguments that the appellant was not on trial for his religious beliefs, and we find no testimony in the record that brings into question any of his religious beliefs. Terrell's claim concerns the testimony of several witnesses. The first allegation of prejudice relates to the testimony of one of Terrell's religious followers who testified that Terrell solicited funds by prophesying to his audiences that tragedy would befall them if they did not make offerings. The witness testified that Terrell said he was a prophet and that he who gave unto him would have a prophet's reward. The Government argues that the manner in which offerings were obtained was relevant to the issue of whether the offerings were given as gifts or as compensation, and that the probative value outweighed any potential prejudice.

■ Two female witnesses were questioned regarding land and property transactions. Appellant argued that the Govern-

ment attempted to imply that he had improper relationships with the two women. The questions directed to these women dealt with the joint property owned by the women and Terrell. In relation to witness Betty Caroline Johnson, the Government obtained court approval before delving into any personal matters. The Government pointed out that on three occasions, Ms. Johnson signed deeds or sale contracts for property as "Betty C. Terrell". In relation to another piece of property, she purchased the property for which the sale contract was drawn up in the names of David and Betty Johnson. Yet the witness claimed that appellant had no interest in the property. The Government contends that examination of this witness was necessary to establish possible bias of the witness and also to establish the possible source and application of some of Terrell's funds. The witness had an income of approximately $300 a month, half of which she gave to the church. Yet her payments on property she purchased in 1977 totalled in excess of $7,000.

In determining whether the probative value of evidence outweighs potential prejudicial impact, this Court must accord great deference to the district court. We do not find that the inquiries in question unfairly prejudiced appellant. The court's rulings on the admission of the challenged testimony must go undisturbed.

We perceive no error in the thorough case presented by the government nor in the careful trial of the case by the district court.

AFFIRMED.