**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Steven DWOSKIN, Defendant-Appellant.**

No. 80–5140.

United States Court of Appeals,
Fifth Circuit.
Unit B

May 4, 1981.

Rehearing Denied June 18, 1981.

E. David Rosen, Miami, Fla., for defendant-appellant.

M. Carr Ferguson, Asst. Atty. Gen., Gilbert E. Andrews, Chief, Appellate Section, George L. Hastings, Jr., Robert E. Lindsay, Tax Div., Dept. of Justice, Washington, D. C., for plaintiff-appellee.

Before HILL, KRAVITCH and HATCHETT, Circuit Judges.

JAMES C. HILL, Circuit Judge:

Stephen Dwoskin appeals from a jury conviction for two counts of income tax evasion for the years 1972 and 1973. 26 U.S.C. § 7201. Evidence produced at trial showed that the appellant's taxable income in 1972 was $75,843.46 as opposed to the $12,728.12 he reported. In 1973 appellant's income was $44,809.50, in contrast to the $5,674.00 he reported. Record, Vol. V, at

595–596. Affording appellant the benefit of income averaging, the government's expert concluded that the appellant's correct tax liability for 1972 was $18,173 as opposed to the $2,278 which appellant reported, and $13,525 in 1973, in contrast to the $928 appellant reported. Record, Vol. V, at 622–24. These calculations were based on evidence which indicated that appellant's net worth increased from $89,705.50 at the end of 1971 to $176,910.78 by the end of 1972, and to $252,349.13 by December 31, 1973. Record, Vol. V, at 584.

To establish a § 7201 violation, the government must prove (1) an additional tax was due and owing, (2) an attempt to evade or defeat such taxes, and (3) willfulness. *Sansone v. United States,* 380 U.S. 343, 351, 85 S.Ct. 1004, 1110, 13 L.Ed.2d 882 (1965). Because a violation of § 7201 is a criminal offense, the government must prove each element of the crime beyond a reasonable doubt. In this case, the government sought to carry its burden by using the net worth method of proof.

### I. *The Net Worth Method*

The basic premise of the net worth method is that most increases in net worth are attributable to taxable income and, as the Supreme Court put it, "when this is not true the taxpayer is in a position to explain the discrepancy." *Holland v. United States,* 348 U.S. 121, 126, 75 S.Ct. 127, 130, 99 L.Ed. 150 (1954). The government offers evidence of the taxpayer's net worth at the end of the tax year in question, subtracting from this figure his net worth at the beginning of the year, and adding to the difference his non-deductible expenditures. The result is ostensibly the taxable income for the year. If this figure substantially exceeds the taxable income reported on the return, the jury is asked to infer that the return was willfully falsified by the defendant. *See* 348 U.S. at 125, 75 S.Ct. at 130; *United States v. Schafer,* 580 F.2d 774, 777 (5th Cir. 1978); Duke, *Prosecutions for Attempts to Evade Income Tax; A Discordant View of a Procedural Hybrid,* 76 Yale L.J. 1, 10–34 (1966).

The appellant offered no evidence at trial. On appeal he argues that the government's evidence was insufficient to fulfill several requisites of a net worth case. Specifically, he contends that the government failed to establish his opening net worth with reasonable certainty and that it failed to exclude non-taxable sources of income as the basis for his net worth increases. Appellant largely attributes these failures to inadequate investigation.

A motion for acquittal must be granted "when the evidence is such that a reasonably minded jury must have a reasonable doubt as to the existence of any element of the crime." *United States v. Slone*, 601 F.2d 800, 803 (5th Cir. 1979); *United States v. Pinner*, 561 F.2d 1203, 1207 (5th Cir. 1977). In evaluating a claim of insufficient evidence according to this standard, we must consider the evidence in the light most favorable to the government, *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), resolving reasonable inferences and credibility choices in support of the jury's verdict, *United States v. Henderson*, 588 F.2d 157, 161 (5th Cir. 1979); *United States v. Juarez*, 566 F.2d 511, 513 (5th Cir. 1978); *United States v. Prout*, 526 F.2d 380, 384 (5th Cir.), *cert. denied*, 429 U.S. 840, 97 S.Ct. 114, 50 L.Ed.2d 109 (1976).

■ To prove its case, the government relied upon circumstantial evidence. Since circumstantial evidence is to be treated no differently than direct evidence, *Holland v. United States*, 348 U.S. 121, 140, 75 S.Ct. 127, 137, 99 L.Ed. 150 (1954), the test for judging the sufficiency of the evidence is the same whether the evidence is direct or circumstantial, *United States v. Bright*, 550 F.2d 240, 242 (5th Cir. 1977); *United States v. Gomez-Rajos*, 507 F.2d 1213, 1221 (5th Cir.), *cert. denied*, 423 U.S. 826, 96 S.Ct. 41, 46 L.Ed.2d 42 (1975).

We are mindful of the Supreme Court's admonition that the net worth method of proof is "fraught with danger for the innocent ...." 348 U.S. at 125, 75 S.Ct. at 130.[1] However, after a careful review of the record we are convinced that the protections established by *Holland* have not been violated and that the evidence is sufficient to convict.

## II. *Establishing A Definite Opening Net Worth*

"An essential condition in cases of this type is the establishment, with reasonable certainty, of an opening net worth, to serve as a starting point from which to calculate future increases in the taxpayer's assets." *Holland v. United States*, 348 U.S. at 132, 75 S.Ct. at 133. Appellant's opening net worth was established as of December 31, 1971. Record, Vol. II, at 117. Appellant challenges the "reasonable certainty" of this figure in several respects.

### A. *Cash on Hand and Unrestricted in Banks*

Appellant's opening net worth was based on a financial statement signed by him and submitted to the Commercial Bank of Kendall for a loan on May 29, 1970. Record, Vol. II, at 117–118. Appellant argues that he was incorrectly credited with a total of only $9,000 for cash on hand and cash unrestricted in banks, when the proper figure was $19,000, the amount he had listed on this May 29, 1970 financial statement. Appellant's Brief, at 4–6, 23. The record shows, however, that the $19,000 figure listed by the appellant consisted of $8,000 in the appellant's personal bank account and of $11,000 in an account owned by the appellant's children, of which the appellant was trustee. Record, Vol. II, at 130. There is no evidence that the appellant used the funds in his children's account. Indeed, the record indicates the account not only existed but also had a higher balance subsequent to the prosecution years. Record, Vol. II, at 131.

The record does show that on several occasions the appellant borrowed money

---

1. "The net worth method, it seems, has evolved from the final volley to the first shot in the government's battle for revenue, and its use in the ordinary income bracket cases greatly increases the chance for error." *Holland v. United States*, 348 U.S. 121, 126–127, 75 S.Ct. 122, 130–31, 99 L.Ed. 150 (1954).

from Dade Federal Savings and Loan where he maintained his children's savings account. The loans were made against the children's account. *Id.* at 205. However, the appellant was given credit in the net worth computations for these and his other bank loans. *Id.* at 75–77.

The government's $9,000 opening unrestricted cash figure consisted of $8,000 from appellant's bank account plus a $1,000 allowance for cash which appellant claimed to have on hand. *Id.* at 63. Based on the above analysis we find the government's figure is "reasonably certain."

### B. *Assets Connected with Auto Electric Supply Business*

Appellant argues that the government's opening net worth statement did not properly credit him for assests connected with the operation of his auto electric supply business. Appellant again makes reference to his May 29, 1970 financial statement in developing this argument. Specifically, he contends that he should have been credited with a $14,000 asset entitled "Accounts and Loans Receivable" and a $65,000 asset simply entitled "Business." Appellant's Brief, at 6. Both assets were listed by the appellant on his May 29, 1970, financial statement.

Again, however, appellant's contentions do not reflect the whole story. Appellant had been engaged in the auto electric supply business since 1962 and on through the prosecution years, 1972 and 1973. Record, Vol. II, at 62. Prior to May of 1971, appellant actually owned two businesses, Auto Electric Service and Auto Electric Suppliers. Record, Vol. II, at 158. In May 1971, appellant incorporated these businesses as one entity, Auto Electric Suppliers, Inc. *Id.* at 158–159. Thus, the appellant's electric supply business assets were effectively subsumed by the new corporate entity.

■ The $65,000 figure represents the appellant's estimate of the fair market value of his business [2] prior to incorporation. The government's opening net worth figure valued the appellant's recently formed cor-

poration, which was comprised of his previous businesses, at $15,026.67. Record, Vol. II, at 149. This figure reflects the corporation's cost basis to the defendant, rather than its fair market value. *Id.* at 156. Indeed, the $15,026.67 figure is taken "from Mr. Dwoskin's books and records concerning [his] corporation as the amount that was transferred to the corporation upon the institution of that corporation." *Id.* at 149. The appellant was not prejudiced by the use of this cost basis figure as it was used throughout the net worth analysis. Furthermore, the appellant's personal tax returns and those of his corporation show that the appellant still owned the corporation subsequent to the prosecution years and that he did not receive any non-taxable distributions from the corporation which would explain his net worth bulge.

■ Appellant also challenges the investigating IRS agent's "assumption" that Auto Electric Service went out of business after Auto Electric Suppliers, Inc. was formed. Appellant's Brief, at 8. This contention is based on the appellant's alleged receipt of a $4,000 check from Auto Electric Service on March 1972—well after the formation of Auto Electric Suppliers, Inc. However, the record is clear that this check was not admitted into evidence because it could not be identified. Record, Vol. II, at 166–167. We can not consider "evidence" which is not in the record.

Finally, appellant alleges that the government failed to investigate two other business entities of the appellant, South Miami Generator and Economy Generator. Appellant's Brief, at 8. The investigating IRS agent conceded that during the early part of his investigation he was unaware of these assets. Record, Vol. II, at 179–180. However, the government called two witnesses at trial who adequately explained appellant's interest in these assets. Record, Vol. III, at 331–337 (Gasparini) and Record Vol. IV, at 460–465 (Viggiani). These assets were fully accounted for in the final net worth computations.

---

2. The record is not clear as to which non-corporate entity "Business" refers to.

Appellant relies on *Merritt v. United States*, 327 F.2d 820 (5th Cir. 1964). Unlike *Merritt*, we find no evidence that the government failed to track down relevant leads. 327 F.2d at 823. *See Holland v. United States*, 348 U.S. at 135–136, 75 S.Ct. at 135–136. In sum, we conclude that the government established appellant's opening net worth with the reasonable certainty required by *Holland*.

### III. *Net Worth Increases Must Be Attributable to Taxable Income*

"[R]equisite to the use of the net worth method is evidence supporting the inference that the defendant's net worth increases are attributable to currently taxable income." 348 U.S. at 137, 75 S.Ct. at 136. Under the Supreme Court's decisions, the government can satisfy this burden in one of two ways. It can show that there is a likely taxable source of the unreported income, *Holland v. United States*, 348 U.S. at 138, 75 S.Ct. at 136, or it can negate all possible nontaxable sources of that income. *Id.* at 137, 75 S.Ct. at 136, *United States v. Massei*, 355 U.S. 595, 78 S.Ct. 495, 2 L.Ed.2d 517 (1958).

The central thrust of appellant's case, both at trial and on appeal, is that appellant's net worth increases resulted from non-taxable income in the form of loans received from his various partners during the course of their real estate dealings. *See* Appellant's Brief, at 8–17; Record, Vol. V, at 744–45. Appellant provided this theory to the government. The government has a burden to "track down . . . leads reasonably susceptible of being checked which, if true, would establish the taxpayer's innocence." *Holland v. United States*, 348 U.S. at 135–136, 75 S.Ct. at 135–136. To resolve whether or not the government carried this burden by negating appellant's "loan theory" we must ex-

amine the appellant's business relationship with his partners.[3]

Beginning in 1970 and through the prosecution years, the appellant made numerous investments in real estate, rental property, and thoroughbred race horses. Record, Vol. II, at 62. Many of these investments were made in a group with four other individuals called the South Dade Investment Group. Record, Vol. III, at 239–40. This group dealt on an extremely informal basis. Often a partner would not contribute his full share of the purchase price at the time of purchase. At such times, one partner would temporarily advance the share of the non-contributing partners. The difference was made up within a short period of time, usually at the time of another purchase. Record, Vol. II, at 79. No documentation of these "loans" was kept. *Id.*

In order to unravel this recordless, comingling of funds the investigating IRS agent conducted an extensive investigation. He examined both public and bank records to document the purchases made by the appellant and his partners. Furthermore, he interviewed many of the individuals with whom the appellant had dealt, including all members of the South Dade Investment Group. Record, Vol. II, at 65–66.

The investigating agent found no documentation for the loans. He also discovered that any such informal loans were regularly settled within 30 to 60 days. Record, Vol. II, at 79–80. Hence, the effect of these loans was cancelled out within the year. Consequently, they were not included in the net worth computations. This conclusion was supported by five different financial statements which the appellant filed with banks in May of 1970, April of 1972, April of 1973, November of 1973, and November of 1974. Government Exhibits 28–30, 35, 37. None of these statements listed any loans from his partners as a liability.

---

**3.** The government also introduced evidence of two potential taxable sources of income which could have accounted for appellant's net worth increases. First, appellant's auto electric supply business could have generated undisclosed income. Acceptance of this theory is buttressed by the testimony of appellant's ac-

countant that the appellant was willing to manipulate his financial statements to achieve a desired result. Record, Vol. IV, at 425–427. Second, the evidence showed that the appellant made profits on several real estate ventures which he failed to report on his tax returns. *E. g.*, Record, Vol. IV, at 428–434.

The appellant challenges the government's "simplistic and mathematical approach" to interpreting these loans. Appellant's Brief, at 11–17. He asserts that the government incorrectly assumed that the appellant paid his full percentage shares for the various properties his financial statements, his tax returns, and certain real estate closings indicated that he owned.

█ The essence of appellant's argument is that his financial affairs must be reduced to an absolute certainty before he can be convicted. To adopt such a position would be to abolish the net worth method. Apparently the appellant would require the IRS to document every transaction among the investing partnership of which he was a member—even though the partnership itself kept no records. The government is not required to perform the impossible. *See United States v. Hiett*, 581 F.2d 1199, 1201 (5th Cir. 1978). Indeed, the net worth situation was created to deal with situations "about as difficult to untie as the proverbial Gordian Knot." *United States v. Schafer*, 580 F.2d 774, 778 (5th Cir. 1978). It should be needless to say that if the appellant's financial dealings could be precisely determined use of the net worth method would be unnecessary.

█ We find that the results of the government's extensive investigation made out a *prima facie* case. "Once the Government has established its case, the defendant remains quiet at his peril." *Holland v. United States*, 348 U.S. at 139, 75 S.Ct. at 137, *United States v. Penosi*, 452 F.2d 217, 220 (5th Cir. 1971).[4]

Finally, appellant asserts that the government's manner of proof was defective. He argues that a net worth case may not be supported by an investigating agent's "unqualified assertions based on his extrajudicial investigation that the numerous loans and advances had no effect upon the year-end balances." Appellant's Brief, at 27. Contending that this issue has not been addressed in our circuit, appellant relies on *United States v. Morse*, 491 F.2d 149 (1st Cir. 1974). In relevant part *Morse* held that if the government has "independent documentation to corroborate the agent's testimony it must be introduced to eliminate the hearsay aspect of [the agent's] testimony." *Id.* at 154–155.

█ In *Morse*, tangible, documentary evidence (liability ledger cards) could have been introduced to corroborate the agent's testimony. *Id.* at 154. Here, in contrast, no documentary evidence of appellant's loans existed. Accordingly, it was necessary for the investigating agent to testify to the non-existence of any documentation. *Morse* explicitly supports the admission of such testimony: "To be sure, the court must rely on mere assertion when the agent testifies that he could find no evidence of other non-income items, but then, of course, no better evidence would exist." *Id.* at 154, n.8. It is not improper for an agent to testify that his investigation failed to uncover sources of nontaxable income. *United States v. Penosi*, 452 F.2d 217, 219 (5th Cir. 1971).

Furthermore, in this case the government introduced the documentary evidence that it had. Specifically, it introduced five financial statements by the appellant, none of which listed loans from partners as a liability.

█ Appellant also suggests that it was error for the government not to call all of the defendant's partners as witnesses in order to develop the "loan" theory. *Morse*

4. Appellant suggests various leads and techniques which he contends would have improved the government's investigation. *See* Appellant's Brief, at 10–18. Of course, had these leads been provided during the investigative process the government would have had an obligation to pursue them to the extent that they were relevant and reasonably susceptible of being checked. *See Holland v. United States*, 348 U.S. at 135–136, 75 S.Ct. at 135– 136. However, the government is not required to assume "the role of a conjurer." *United States v. Hiett*, 581 F.2d at 1201. Rather, its burden is to establish a *prima facie* case which it did here. Having done this, it is the defendant's burden to rebut. See 348 U.S. at 138–139, 75 S.Ct. at 136–137. Needless to say, the defendant can not begin his rebuttal on appeal as he seeks to do here.

does not support "the proposition that the government must introduce those items which it does not believe entitle the taxpayer to a reduction in the alleged understatement of his taxes." *United States v. Lawhon*, 499 F.2d 352, 356–357 (5th Cir. 1974), *cert. denied*, 419 U.S. 1121, 95 S.Ct. 804, 42 L.Ed.2d 820 (1975). The government concluded that the testimony available from the partners would not substantiate the defendant's loan theory. Appellee's Brief, at 35. The government is not required to present their case as well as defendant's rebuttal.

The burden of proof was not impermissibly shifted in this case. The government established a *prima facie* case and the defendant remained silent at his own peril. *Holland v. United States*, 348 U.S. at 138–139, 75 S.Ct. at 136–137. We find the appellant's argument regarding the agent's failure to make use of the grand jury testimony to be without merit.

The government proved its case. Accordingly, appellant's conviction is

AFFIRMED.