889 F.2d 1089
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Gordon CARPENTER, Defendant-Appellant.
 No. 88-2190.
 United States Court of Appeals, Sixth Circuit.
 Nov. 21, 1989.
 
 Before WELLFORD and ALAN E. NORRIS, Circuit Judges, and LIVELY, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 In 1972 the appellant, Gordon Carpenter, formed Antenna Specialities, which installed cable systems in the television industry. Throughout the 1970s the business grew rapidly to the point where the appellant employed over 300 employees. As a result of this growth, appellant formed other cable related entities. The appellant operated each of these cable related businesses from the same office in Michigan and was at all times in operational control of all these related businesses.
 
 
 2
 Each of these businesses had a responsible secretary. Appellant picked up the mail each morning and distributed to the particular secretary the mail for that business. When a work crew completed work or sold equipment to a customer, the work crew gave the responsible secretary the necessary record of such work or sale. The secretary then generated an invoice which was mailed to that customer. When the customer would mail a check back, that particular secretary would then make a record of such payment in the account book, and then deposit the checks into the bank account of that business.
 
 
 3
 There was testimony at trial that Carpenter maintained some of the customer account books himself and asked his secretaries to generate hand-typed invoices apart from the normal course. When payment came in from these invoices, he would mark the account paid in his books which Carpenter kept in his office and handled the deposit of these checks himself. These customer checks, handled by Carpenter personally, were current and were not held for over one year. Testimony also indicated that appellant not only deposited these checks into his own personal account but that he also took these customer checks and obtained cashier's checks and money orders in substantially high dollar amounts. Testimony also indicated that appellant used business loans for his own individual benefit.
 
 
 4
 Through the years 1977 to 1982, the appellant reported negligible, if any, amounts of taxable income to the Internal Revenue Service (IRS). IRS began to investigate Carpenter during 1985. From interviews with the appellant and interviews with other individuals connected with his several businesses, IRS concluded that (and appellant originally admitted) that $5,000 was all the cash available to him and his spouse personally during the period 1978 through 1984.
 
 
 5
 The appellant was subsequently indicted by the grand jury in a two count indictment, which charged that appellant, in 1981, had a taxable income of over $370,000 with a tax due of some $131,000 instead of that reported as taxable income of only $22,000 with a tax shown of about $1,000. For the year 1982, the indictment charged that he had nearly $400,000 taxable income and that the tax due was approximately $154,000 instead of what he reported as 1982 income of $9500 with an income tax reflected of only $2800. Shortly prior to trial, the defendant's net worth[1] was amended pursuant to additional documentation provided by appellant's counsel so that the appellant's taxable income for 1981 was claimed to be in excess of $194,000 and a tax due of over $66,000; for 1982, a taxable income of $328,000 with tax due of $132,000.
 
 
 6
 Defendant contends that the IRS erred in determining his net worth for two principal reasons. First, he claims IRS failed to compute correctly the cash on hand available to him and his wife on December 31, 1980. He claims that the court erred in failing to take into account an alleged cash hoard of over $200,000 which was given to him by his wife in early 1982. Second, he also claims that the government failed to track down leads despite his furnishing the IRS agents with leads which would have resulted in a lower taxable income for the years in question. The jury found Carpenter guilty, and we affirm on appeal.
 
 1. Defendant's motion for acquittal
 
 7
 The appellant first contends that the trial court erred in refusing to grant his motion for acquittal since the government allegedly failed to follow leads which the appellant had supplied to the government. The government uses a net worth method of prosecution to determine tax liability when a taxpayer's records are either inadequate, concealed, or unavailable for some other reason. Under this method, the government
 
 
 8
 attempts to establish an "opening net worth" or total net value of taxpayer's assets at the beginning of a given year. It then proves increases in taxpayer's net worth for each succeeding year during the period under examination and calculates the difference between the adjusted net values of the taxpayer's assets at the beginning and end of each years involved. The taxpayer's nondeductible expenditures, including living expenses, are added to these increases, and if the resulting figure for any year is substantially greater than the taxable income reported by the taxpayer for that year, the Government claims the excess represents unreported taxable income.
 
 
 9
 Holland v. United States, 348 U.S. 121, 125 (1954). Under Holland, the government is required to investigate any reasonable lead which might tend to establish a taxpayer's innocence, or lower the amount of tax claiming to have been evaded for purposes of criminal liability. If the government fails to follow up on these leads in a reasonable fashion, the court may accept as correct whatever information would have been discovered if the lead had been reasonably pursued. Holland, 348 U.S. at 135-36.
 
 
 10
 A motion for acquittal "must be granted 'when the evidence is such that a reasonably minded jury must have a reasonable doubt as to the existence of any element of the crime'." United States v. Dwoskin, 644 F.2d 418, 420 (5th Cir.1981). A reviewing court must look at the evidence in the light most favorable to the government, however, and must resolve all inferences and credibility determinations in favor of the government. Dwoskin, 644 F.2d at 420. Appellant has failed to meet this standard; the motion for acquittal was properly rejected.
 
 
 11
 Indeed, there was substantial evidence to indicate that the government did everything that might be reasonably expected. Agent Klinge served summonses and subpoenas on both banks in pursuing leads grudgingly and belatedly furnished. The IRS agents involved in the cashier check and money order transactions stayed in contact with both banks in an attempt to speed up the process of determining the extent of these transactions, and offered to go through the documents at the bank themselves. One bank said they could handle it better internally as they were not computerized; the other bank said that it was unable to find several items because of poor microfilm quality, or they were simply lost. Evidence turned over to the government by the appellant prior to trial was, in fact, taken into consideration as IRS subsequently reduced the appellant's taxable income in both 1981 and 1982.
 
 
 12
 In our view, the evidence that the government produced at trial was still sufficient for reasonable factfinders to convict the appellant. See Holland, 348 U.S. at 136. The record clearly supports a finding that the government produced evidence of very substantial increased taxable income far beyond what the appellant claimed was his taxable income. There was no error in denying the motion for judgment of acquittal.
 
 
 13
 2. Failure to prove likely taxable source of unreported income and/or failure to negate all possible nontaxable sources of income.
 
 
 14
 The appellant's second contention is that the evidence which the government produced at trial was insufficient to support either the taxable source which the government contended accounted for the increases in appellant's net worth and/or that the government failed to negate a nontaxable income source. The thrust of the first part of appellant's argument is that records as to appellant's likely taxable source of unreported income was destroyed by a flood. He claims all the records were in a storehouse which was destroyed when the building was flooded. Thus, Carpenter claims that there was a lack of evidence to support the government's theory that he diverted funds from customers' checks to his own benefit. The government, however, produced numerous witnesses, including two of the appellant's former secretaries, as well as banking officials, who testified that the appellant kept separate books for certain accounts, generated separate hand-typed invoices for these accounts, deposited checks which were attributable to those accounts, and deposited those checks into his own account or procured cashier's checks or money orders in substantially high dollar amounts. The government may rely on this circumstantial evidence, pointing strongly to concealment of income, and "circumstantial evidence is to be treated no differently than direct evidence...." Dwoskin, 644 F.2d at 420. It is not required that the government prove each element of this unreported income with absolute precision.
 
 
 15
 To adopt such a position would be to abolish the net worth method.... The government is not required to perform the impossible. Indeed, the net worth situation was created to deal with situations "about as difficult to untie as the proverbial Gordian Knot." It should be needless to say that if the appellant's financial dealings could be precisely determined use of the net worth method would be unnecessary.
 
 
 16
 Id. at 423 (citations omitted). In the case at bar, not only was there sufficient evidence to prove the likely source of taxable income, the government was also able to negate the nontaxable sources of income of appellant. Evidently, the jury simply did not believe the appellant's story that his wife had amassed a $200,000 fortune over the preceding years and keeping the money in a box in the closet. This claim of appellant is without merit.
 
 
 17
 3. Refusal to instruct the jury as a matter of law with regard to the government's failure to follow leads.
 
 
 18
 The appellant contends that the trial court erred when it refused to instruct the jury that the government failed, as a matter of law, to pursue leads provided it by the appellant. He further contends that this failure to follow those reasonable leads led to an incorrect net worth. Appellant's contention is not well taken. A party is not entitled to an instruction on his theory of the case if that party does not produce sufficient evidence of such theory. United States v. Jerde, 841 F.2d 818, 822 (8th Cir.1988). The appellant simply failed to produce sufficient evidence of his contention which challenged the government's showing. Even if the appellant's theory about the missing cashier's checks were true, there was simply no evidence to support his contention about the amount of those checks. "[I]t is not error for the court to refuse a request to instruct as to a defendant's theory of the case where facts making up the theory, if believed, will not defeat the factual theory of the prosecution." United States v. Silvestri, 790 F.2d 186, 192 (1st Cir.1986). In this case, even if we believed that there were missing cashier's checks floating around, Carpenter was still not entitled to an instruction he sought, because the government presented overwhelming evidence that there had been substantial increases in his net worth.
 
 
 19
 4. Did appellant receive a fair trial?
 
 
 20
 The appellant contends that the trial court's denying him an opportunity to cross-examine a witness, Ms. Eigenhouse, as to certain matters on which she had subsequently invoked her fifth amendment privilege against self incrimination denied him a fair trial. Ms. Eigenhouse was one of appellant's secretaries who knew about the separate books and deposits. She testified about writing duplicate payroll checks to another employee, keeping one of those checks, and then cashing it. Upon cross examination, she invoked her fifth amendment privilege against self incrimination, and the court struck that portion of the testimony which dealt with her embezzlement.
 
 
 21
 The appellant contends that Ms. Eigenhouse's testimony about her embezzlement affected the appellant's net worth and that the jury somehow inferred that her crime was a part of appellant's crime. This argument is totally without merit. There is simply no evidence that her alleged embezzlement was in any way related to, or connected with, the appellant's own criminal actions. The trial court did not commit error in this type of situation and in striking a portion of Ms. Eigenhouse's direct testimony. United States v. Stephen, 492 F.2d 1367, 1375 (6th Cir.1974). The record reveals that the appellant was allowed to cross examine the witness on all matters which were relevant to the increase in his unreported taxable income source. Appellant has established no basis to warrant a reversal.
 
 
 22
 We, accordingly, AFFIRM the conviction.
 
 
 
 [1]
 The amount of income and tax was calculated by IRS on the net work method, at least in substantial part